IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION


*******

SAYPO CATTLE CO.,                                    CV 11-10-H-CCL

      Plaintiff,

-v-                                                  <u>OPINION & ORDER</u>

RMF DEEP CREEK, LLC a Delaware
limited liability company, and
FIRST MONTANA TITLE COMPANY
OF HELENA, a Montana corporation,

      Defendants.

and                                    *******

RMF DEEP CREEK, LLC,

      Counter-Plaintiff,

-v-

SAYPO CATTLE CO.,

Counter-Defendant.

*******

Before the Court are the parties' cross-motions for summary judgment.  The matter came on regularly for hearing on September 6, 2012.  Plaintiff was represented by Mr. James H. Goetz and Mr. Trent M. Gardner.  Defendant was represented by Mr. Jonathan R. Bass and Mr. Mark D. Etchart.  Having received oral argument and having reviewed the briefs and all the record, the Court is prepared to rule.

Pursuant to Fed. R. Civ. P. 56, Plaintiff moves for

1.  partial summary judgment as to RMF's Third Counterclaim alleging Fraud (Doc. 31);

2.  partial summary judgment as to RMF's First and Second Counterclaims for Breach of Contract (seeking the Court's ruling that (1) the Loan/Promissory Note and the Option Agreement constitute a single integrated transaction; and (2) RMF's Loan to Saypo is usurious) (Doc. 53); and

3.  partial summary judgment as to RMF's Fifth Counterclaim for breach of

2

contract (claimed right to exercise the Option) (Doc. 102).

RMF moves for summary judgment as to the Amended Complaint in its entirety, pursuant to Fed.R.Civ.P. 56.  In the alternative, RMF seeks partial summary judgment as to Saypo's usury claims and defenses (requesting specific findings of material fact pursuant to Rule 56(g), Fed.R.Civ.P.).

**STATEMENT OF FACTS**

In early 2010, Jack Salmond wished to sell his 12,000 acre ranch (dba Saypo Cattle Ranch) in Teton County, Montana.  At the time, Salmond was an 80% shareholder in Saypo Cattle Company.  Salmond retained a real estate broker to help him sell the property and his agent, James Esperti, contacted Daniel Schlager, President of Conservation Solutions, LLC, as a potential buyer, inviting him to visit Montana for a tour of the property.  Conservation Solutions, LLC, a Wyoming conservation investment company, was indeed interested in buying the property, and its two principals, Daniel Schlager (President) and Jamie Crowley (Vice President), visited the Saypo Cattle Ranch in March 2010, touring the

3

property with Jack Salmond, Esperati, and another brokerage agent, B. Elfland.

Liking what they saw, Schlager and Crowley began negotiating with Salmond

regarding purchase of the property.  There were complications.  Salmond was the

majority shareholder in Saypo, but Saypo was in various stages of litigation

(threatened and actual) with its minority shareholders regarding the Saypo Ranch.

One of the minority shareholders had recorded a lis pendens on the Ranch.

Salmond had fallen behind in his payments to buy out a minority shareholder.

Also, one of Saypo Ranch's neighbors held a right of first refusal on any sale of

the Saypo Ranch, effective until April 1, 2011.  Finally, as part of a marital

property settlement, Salmond owed $2.5 million to his ex-wife, who held a

mortgage on the property, and a balloon payment was coming due in April, 2011.

In short, Saypo did not have a clean title to convey to Conservation

Solutions or to any other purchaser.

Saypo shared with Schlager and Crowley the results of a 2010 appraisal

performed by Clark Wheeler for the Nature Conservancy that valued the Ranch at

approximately $11 to $12 million for conservation easement purposes.  (Docs. 94-

4

5 & 94-6, Second Aff. Jonathan Bass, Exs. T-U.)  Salmond believed that the $14 million price was a fair one, and he so stated that it was a "fair and reasonable price" in his written description of the deal for the Saypo Board of Directors. (Doc. 78-4, Bass Aff., Ex. D.)

Schlager and Crowley's only interest was in purchasing the Ranch. Conservation Solutions (in which Schlager and Crowley were the two principals) had no interest in lending Saypo money, and they would not have done so but for the fact that it would facilitate its purchase of the Ranch.

This was an arms-length transaction in which Saypo and Jack Salmond were represented by Saypo's attorney, Neal Christensen, and in which virtually every significant term of every agreement was the subject of extensive negotiation. After weeks of negotiations, in May, 2010, Saypo and Conservation Solutions/RMF[1] arrived at certain agreements that would bring the parties

---

[1]    RMF Deep Creek is a single-member limited liability company formed under the laws of the State of Delaware, with its principal place of business in the State of Colorado.  RMF's single member is Conservation Solutions Partners II LLC.  RMF was formed on June 15, 2010, by Conservation Solutions for the purpose of purchasing the Saypo Ranch.

somewhat closer to the desired purchase and sale of the property: (1) RMF would lend Saypo $5 million at 6% interest (promissory note to be secured by a mortgage on the Saypo Ranch) to permit Saypo to obtain clear title to the Ranch; and (2) Saypo would give RMF an option to purchase the Ranch for $14 million during the exercise period of April 2, 2011, until May 2, 2013.  For the next month, well into mid-June 2010, the parties and their attorneys drafted, redrafted, and revised their documents.  The details of these agreements are important to the disputes and arguments of the parties, and must necessarily be scrutinized more closely.

Document No. 1: The Loan Agreement.  On June 24, 2010, the parties agreed that RMF would lend $5 million at 6% interest without any payment required for two years ("the Initial Term") until June 1, 2013 (the "Maturity Date"), at which time Saypo could unilaterally extend the loan for an additional two years until June 1, 2015 (the "Extended Maturity Date").  It was important to Salmond that he have a five-year loan and that he not be required to make any payment on it for five years (although the parties agreed that Saypo could pay off the loan at any time).  Thus, under the terms of the Promissory Note, Saypo was

6

required to make no payments on the $5 million loan for five years.  However, during the last two years between the Maturity Date and the Extended Maturity Date, a higher interest rate of at least 13.5% would apply.  In no event, however, was the interest rate to be permitted to rise above the legal limitation fixed by Montana's usury statute, which at this time was 15% interest, pursuant to the "Limitations on interest" clause).  Thus, Saypo negotiated for, and received, a five-year term during which no payments would be required prior to the Note coming due on June 1, 2015.  Although the initial maturity date came within three years, the parties negotiated for and expected that, unless Saypo repaid the loan early, their agreement would result in a five-year loan term.

However, the parties anticipated that early in that five-year period ending on June 1, 2015, much would be settled regarding the Saypo Cattle Ranch.  As of June, 2010, the Saypo Ranch was on the real estate market and might be sold to a third-party.  One of the Ranch's neighbors might then exercise his right-of-first-refusal on or before April 1, 2011.  After that, RMF might exercise its option to purchase the property for $14 million between April 2, 2011, and May 2, 2013.

7

Thus, the parties had good reason to hope and even to expect (especially given RMF's genuine desire to purchase the property) that the Saypo Ranch would be sold before the first Maturity Date of June 1, 2013.  If the property were not sold by that date, the parties expected that Saypo would extend its payment deadline (unilaterally and without penalty) another two years until the Extended Maturity Date of June 1, 2015.

In addition to the 6% interest payment, the Promissory Note also provided that if the Ranch were to be sold to a third-party, a Shared Appreciation Payment ("SAP") of $1.75 million would be paid by Saypo to RMF, and the SAP would first come due on June 1, 2013 (subject, however, to Saypo's unilateral right to extend the due date, without making any payment, for another two years).  The Promissory Note explains that the parties acknowledged that the very fact that the loan allowed Saypo to clear its title would in itself result in a substantial increase in the marketability and the ultimate dollar value of the Ranch.  The parties therefore agreed to share that increment of appreciation attributable to and derived from the $5 million loan, and the parties fixed RMF's share at $1.75 million as the

Shared Appreciation Payment.  However, RMF agreed to waive its right to the

$1.75 million SAP under two conditions: first, RMF would waive the SAP if it

(RMF) purchased the property by exercising its Option; second, RMF would

waive the SAP if Saypo paid RMF a different payment provided for by the Option

Agreement, called the "Sale Prior to Exercise Payment" ("SPEP").

     The Shared Appreciation Payment (or SAP) is mirrored by a similar

obligation undertaken by RMF.  In RMF's Contingent Promissory Note,

representing the terms by which RMF agreed to purchase the Ranch for $14

million, RMF agreed that if it purchased the Ranch and then resold it to a third

party, RMF would pay a Shared Appreciation Payment to Saypo consisting of

about 40% of the sales RMF's profit on resale.  (Doc. 60, Schlager Aff., ¶ 16.)

     The Court notes that the Promissory Note thus tended to encourage Saypo to

sell the Ranch to RMF by means of several different provisions: (1) the low

interest rate of 6% encouraged Saypo to sell the ranch during the first three years

of the loan rather than extend the loan into an additional two-year period at a

higher interest rate, (2) no payments were required on the loan until after RMF's

Option period elapsed, meaning that Saypo could sell the Ranch to RMF and then simply repay the $5 million loan from the proceeds of the sale thereby alleviating the need to find some other source of funds for repayment of the loan, and (3) the $1.75 million Shared Appreciation Payment would be waived entirely if Saypo sold the Ranch to RMF.  It is apparent from the documents that RMF structured its side of the deal to favor a Saypo-RMF sale.  It is clear from these documents that RMF's overriding interest was to purchase the Ranch and not to lend money.  It is also apparent that while Saypo clearly desired to sell the Ranch, Saypo's primary goal in June 2010 was to borrow a substantial amount of money to clear title and allow a sale.

Document No. 2: The Option Agreement.  On June 24, 2010, the parties agreed that Saypo would grant RMF an Option to Purchase the Saypo Ranch during the exercise period of April 2, 2011, to May 2, 2013, for the sum of $14 million.  As consideration for the Option, RMF agreed to pay Saypo $250,000 Option Fee immediately and another $125,000 on May 2, 2011.  RMF also agreed to pay Saypo a monthly payment (referred to as the "Consideration for Information

Gathering and Plan Preparation") of $10,417 beginning on May 2, 2012, until the closing of RMF's purchase of the Ranch or RMF's notice of abandonment of the Option or May 2, 2013, whichever came first.  These monthly payments to Saypo represented payments for Saypo's preparation of a plan for RMF's future management of the Ranch and for collection of historical, conservation, and management information regarding the Ranch.  The Option Agreement also contains a provision whereby the parties agree to enter into a separate Management Consulting Agreement between RMF and Jack Salmond (worth $285,000 over three years, *see* Doc. 60, Aff. of Schlager, ¶ 17), whereby Salmond agrees to serve as paid consultant to RMF in managing the property during the three years following RMF's purchase of the property.

Under the Option, if RMF exercises its Option to Purchase, RMF agrees to pay Saypo $7,150,000 for the Ranch (cash and loan forgiveness), plus a Contingent Note for $6,558,856 secured by a mortgage.  Saypo agrees to credit RMF with any prior monthly payments made and the $250,000 Option Fee.

Clearly, RMF hoped to purchase the Ranch.  Salmond did not give up hope

11

of obtaining a better price, however.  Salmond and Christensen negotiated for and received a ten-month period (June, 2010 to April 1, 2011) within which Salmond could sell the property to a third party.  However, this right was not free.  RMF negotiated for a payment in exchange for Saypo's retention of a right to sell to a third party.  The SPEP thus represents the dollar value that the parties negotiated to permit Saypo to sell the property to a third party on or before April 1, 2011, despite RMF's Option to Purchase.  It is a form of compensation to RMF for Saypo's demanded right to sell to a third party despite RMF's Option.  Under the Option, if Saypo sells the Ranch to a third-party prior to the Option Exercise Period (*i.e.*, prior to April 2, 2011), then Saypo agrees to refund RMF's $250,000 Option Fee and to pay RMF 14% of the third-party sale consideration received by Saypo.  This 14% payment is called the "Sale Prior to Exercise Payment" or "SPEP", and in the briefing has occasionally been referred to as the "Lost Opportunity Payment," the "Option Termination Payment," or the "Buyback Payment."  Upon Saypo's payment of this SPEP to RMF, the Option terminates and both parties are released from all obligations under the Option.

12

Under the Default provision of the Option, if either party is required to retain an attorney to enforce the Option, the defaulting party agrees to pay the prevailing party's reasonable attorney fees.

The Court notes that RMF structured its side of the Option agreement to encourage Saypo to sell the Ranch to RMF through several different provisions: (1) Saypo is required to make a substantial payment to RMF (the 14% SPEP) if Saypo sells the Ranch to a third-party before the Option Exercise Period; (2) RMF waives the 14% SPEP if Saypo sells the Ranch to RMF; (3) Saypo will receive additional payments (the $125,000 payment on May 2, 2011, the monthly $10,417 payments beginning on May 2, 2012, and Salmond's Management Consulting Fee), if Saypo forgoes any opportunity to sell the property to a third party prior to RMF's Option Exercise Period.

Clearly, RMF structured its side of the deal for the purpose of encouraging Saypo to sell the Ranch to RMF and discouraging Saypo from selling the Ranch to third parties.  Equally clear, Saypo structured its side of the deal for two purposes. Saypo's first purpose was to obtain cash funding (the $5 million loan, the

13

$250,000 Option Fee, the additional $125,000 Option Fee, and the $10,417 monthly payments beginning in May, 2012), which cash would permit Saypo to clear its title, thus paving the way for sale, and would also permit Saypo to fund its Ranch operations during the pendency of the Loan and the Option. Saypo's second purpose was to obtain a well-defined offer to purchase the Ranch from RMF, while still retaining its ability to seek yet another higher offer.

Saypo's Sale to a Third Party. Although RMF brought Saypo to the dance, it did not get to take Saypo home. Just two months after the Saypo-RMF deal was struck, Saypo did find a buyer who made a better offer on the Ranch. On August 27, 2010, Gordon Dyal offered Saypo $20.5 million for the Ranch, and Saypo agreed to accept that offer. The Dyal sale would exclude an important piece of the Ranch known as the 40-acre property.[2] The closing was set for November 12, 2010. RMF agreed to cooperate with Saypo to assist it in closing

_____

[2] Under the terms of RMF's Option, RMF's $14 million offer included purchase of the 40-acre parcel, but Salmond was to retain a life estate in that property. This small parcel of property covered by the Option agreement was not sold to Dyal, and is still owned by Jack Salmond.

the Dyal sale, but RMF expected to be repaid the following sums from the Dyal

sale proceeds: the principal sum of $5,000,000 on the Note and Mortgage, 6%

interest in the amount of $111,780.82, a refund of its Option Fee of $250,000, and

an Option Termination Fee (referred to in the Option agreement as the "Sale Prior

to Exercise Payment" or "SPEP") of $2,870,000.00.  This latter fee, which is

specified in paragraph 3 of the "Option to Purchase Real Estate" agreement

between RMF and Saypo, represents 14% of the consideration that Gordon Dyal

paid Saypo for the Ranch.

      In order to effectuate the closing, RMF's principal, Daniel Schlager, settled

these terms by email with Saypo's attorney, Neal Christensen, who replied to

Schlager's email by approving a total payout figure of $8,231,780.82 (broken

down into subunits of $5,00,000, $111,780.82, $250,000, and $2,870,000).  Saypo

attorney Christensen then emailed Rena Spangler, the Manager of First Montana

Title Company, and he informed her that "[t]he payoff to RMF for the Mortgage

and Option will be as shown below: a total of $8,231,780.82."  (Doc. 43-9.)

Christensen added, "I'll be sending you an actual payoff certificate for this

15

amount, but thought it would be helpful for you to have the number." (Doc. 43-9.)

Based on the parties mutual understanding of RMF's payout at the time of the Dyal closing, Schlager executed a Release of Mortgage and Termination of Option and emailed them to the Rena Spangler, the Manager of First Montana Title Company, on the closing date of November 12, 2010, with instructions that they were to be recorded after RMF was wired its share of the proceeds of the Saypo-Dyal closing.

While these closing preparations were being made, however, Saypo was in the midst of working to delay the closing after discovering on September 27, 2010, (through its accountant) that it could obtain a significant tax advantage (approximately $4 million in tax savings) if it closed the sale in 2011. The closing was rescheduled for January 5, 2011. RMF informed Saypo's attorney, Neal Christensen, that its payout figure would change because the 6% interest would continue to accrue on the $5 million loan between November 12, 2010, and January 5, 2011. RMF's release documents were already in the possession of the title company since November, and the escrow agent merely needed a revised

Payout Certificate for closing.

Communications Between the Parties to Prepare for Final Saypo-Dyal Closing.  On Thursday, December 23, 2010, Rena Spangler emailed Dan Schlager and asked him for "a payoff statement valid through 1/6/11 with a daily interest figure for the Saypo/RMF Creek loan?"  On Friday, December 24, 2010, Dan Schlager replied to Rena Spangler, and told her that he was visiting relatives for the holidays and asking whether he could provide the payoff statement on January 3.  Rena Spangler replied by email on Wednesday, December 29, 2010, telling Schlager that January 3rd would be fine to get the Payout Certificate to her, "but if there is any way to get the amount verbally sooner, I'm sure Saypo and their attorney would be happy."

Dan Schlager then emailed Neal Christensen on Friday, December 31, 2010, and gave him RMF's itemized list of pay-off figures, saying:

Good afternoon Neal,

I hope that you are in the midst of a very pleasant holiday season filled with family and friends.  Best wishes from Jamie and I for a very happy and healthy New Year.

17

I hope that the year will begin with a successful close of the Saypo transaction upon which you have labored long and hard and to great effect.  Rena, from First Montana Title Co., e-mailed me inquiring about a pay-off amount for our loan, so I am assuming that all remains on track for the January 5, 2011 close.  Is everything on schedule and in order for a closing on January 5?

I thought it best to relay a pay-off figure to you for your review prior to sending one to Rena.  Here it is:

$5,000,000.00      (loan principal)
$  156,986.30      (interest for 191 days based on 365 day year, including
                         final day: 6/29/10 - 1/5/11)
$  250,000.00      (return of option payment)
$2,276,986.30      (TOTAL PAY-OFF AMOUNT DUE)

Interest per day = $821.91

Please review and confirm, after which I will pass final figure pay-off and daily interest figures along to Rena.

Have a wonderful New Year's!

Best regards,

Dan

(Doc. 78-9, Aff. Jonathan Bass, Ex. I at 2.)

Neal Christensen replied to Schlager's email on Friday, December 31, 2010,

at 8:37 p.m., as follows:

> Dan,
>
> Yes, I've enjoyed lots of family time during the Christmas days, and will spend New Years Eve with friends.
>
> The calculations below [referring to Schlager 12/31/10 email] appear correct, consistent with the November figures except as to 6% interest which you have updated through 1/5/11.
>
> Yes, we're still on track for a 1/5/11 closing.  Hopefully no surprises from Letterman in the New Year.
>
> Thanks,
>
> Neal

(Doc. 78-9, Aff. Jonathan Bass, Ex. I at 2.)

Schlager replied to Rena Spangler by email on Friday, December 31, 2010, "Per your earlier inquiry, below are the pay-off figures (and I have confirmed them with Neal Christensen. Total pay-off: $8,276,986.30; Interest per day: $821.91."

Rena Spangler replied to Schlager on Monday, January 3, 2011, at 8:38 in the morning, and sent a copy of her email to Neal Christensen:

> I'm assuming that the difference is in the interest figure and will

19

adjust my figures accordingly.  What day is the revised payoff good
through so I can adjust the total to conform to the actual day I will
wire funds?  And could you forward wire instructions for the payoff?

Dan Schlager replied by email less than three hours later,

Yes, your assumption is correct – just the interest figure changed.
The revised payoff is good through January 5, 2011.  I have attached
revised RMF Escrow Instructions reflecting the January 5 close date
and a revised RMF Payoff Certificate.  The Escrow Instructions will
require your and Neal's signatures.  Please return a fully executed
version to me.  The Payoff Certificate includes the wiring instructions
for RMF.  Let me know if you need anything else from us, and thank
you again for your handling of this transaction.

Neal Christensen replied to Dan Schlager on January 3, 2011 at 2:57 pm, also

sending a copy of his email to Rena Spangler and Jamie Crowley:

Dan and Rena,

I think the date of payoff certificate referenced in paragraphs
A.1.b.(2) and C.3 should be changed from 11.12.10 to 1.3.11.

Should I just mark it up that way and sign it, or do you want Dan to
make the changes and resubmit for our signature.

Let me know,
Neal

Schlager replied by email to Neal Christensen (copying the email to Rena

Spangler and Jamie Crowley) at 5:04 pm: "Thanks Neal for catching that error.

Please just mark it up and sign it.  Dan"

Neal Christensen then replied as follows:

| | |
|---|---|
| From: | Neallaw [address redacted] |
| Sent: | Monday, January 3, 2011 2:49 PM |
| To: | Dan Schlager [address redacted] |
| Cc: | Rena Spangler [address redacted], Jamie Crowley [address redacted], Jack Salmond [address redacted] |
| Subject: | Re:   Saypo/Dyal transaction |
| *Attach:* | *1.3.11 RMF Escrow Instructions (edited and signed by Neal).pdf* |

Dan and Rena,

Here it is, marked-up, initialed and signed.

Thanks,

Neal

(Doc. 43-12, Aff. Daniel Schlager, Ex. L, emphasis added.)  With this last email,

Neal Christensen signed the Escrow Instructions, already executed by Daniel

Schlager for RMF, and emailed them to First Montana Title Company on behalf of

Saypo, confirming the $8,276,986.30 total payout to RMF from the Dyal sale

proceeds.

On the basis of these communications between the parties, the Saypo-Dyal closing stayed on track for Wednesday, January 5, 2011, with First Montana Title Company acting as escrow agent.

<u>Saypo Files Suit on January 3, 2010</u>.  Although on December 31, 2010, Schlager asked Christensen, "Is everything on schedule and in order for a closing on January 5?" and Christensen replied, "Yes, we're still on track for a 1/5/11 closing[,]" apparently not everything was really on track.

On December 31, 2010, while Saypo's transaction attorney, Neal Christensen, was reassuring RMF that they would receive their $8 million payout, Saypo's litigation attorney, Kevin Jones, was preparing a complaint to be filed in state district court to prevent RMF from receiving their $8 million payout.  In fact, on January 3, 2011, the day that Saypo's attorney, Neal Christensen (with notification to Jack Salmond, sole shareholder of Saypo) signed and dated the Escrow Instructions and emailed them to First Montana Title Company, thereby instructing First Montana Title to wire $8 million to RMF at the end of the Dyal

22

closing–Saypo was, at 11:07 a.m. of that same day, filing a Complaint in Lewis

and Clark County, First Judicial District, charging RMF with usury.

On January 4, 2011, Saypo's attorney Kevin Jones filed an Amended

Complaint that added First Montana Title Company of Helena as a Defendant to

its suit and sought a preliminary injunction against Defendant First Montana Title

Company to prevent it from distributing to RMF that portion of the closing

proceeds claimed by Saypo to represent usurious interest ($2,734,520.55).[3]  Also

on January 4, 2011, Kevin Jones filed a Certification Regarding Notice of Hearing

_____

[3]    The Motion for TRO states that "RMF has asserted that it expects to be
paid $8,276,986.30 at Closing in connection with the payoff of the $5,000,000.00
Note, including $3,126,986.30 of Loan Interest." (Saypo arrived at this total
interest amount by adding the 6% interest payment of $156,986.30, a $100,000
Loan Origination Fee paid out of the loan principal, and the $2.87 million
SPEP/Option Termination Fee provided under the Option agreement.)  Saypo
asserts that the 15% maximum amount of interest permitted by Montana statute for
the loan period (191 days) equals $392,465.75.  Since Saypo had already paid
$100,000.00 as a Loan Origination Fee, Saypo asserts that it is liable for only
$292,465.75 in interest, certainly not the $3,026,986.30 amount being demanded
at closing by RMF.  The difference between these two last figures provides the
disputed interest amount, which is defined by the Amended Complaint to be
$2,734,520.55.  In its Amended Complaint, Saypo seeks treble damages of
$6,253,972.60 under Montana's usury statute, Mont. Code Ann. § 31-1-108.

at 1:54 p.m.  Apparently Jones had presented his Motion for Temporary

Restraining Order that morning to the state court, because one of his affidavits in

support thereof was filed stamped on January 4, 2011, at 9:56 a.m. (Doc 1-2 at

49.)  The fact that the Motion for Temporary Restraining was not actually file

stamped by the clerk until January 5, 2011, at 3:35 p.m., is not particularly

relevant here.  In his January 4, 2011, Certification Regarding Notice of Hearing,

Jones states that he had been informed "this morning" by the Clerk of Court that a

hearing had been scheduled on the Motion for Temporary Restraining Order for

2:30 p.m. that very day.  Jones avers that he "made reasonable effort" between

11:10 and 11:15 a.m. to notify RMF and Daniel Schlager by telephoning his office

phone number on the Conservation Solutions, LLC letterhead.  Jones also avers

that he left a detailed message on both Mr. Schlager's voice mail and Mr.

Crowley's voice mail as to the 2:30 p.m. hearing, but neither returned the phone

call.

      In order to be perfectly clear about the matter, Saypo followed up its

Amended Complaint by filing a Motion for Temporary Restraining Order on

January 5, 2011, at 3:35 p.m., against RMF and First Montana Title Company to prevent the title company from disbursing proceeds in the amount of $2,734,520.55 (*i.e.*, to deduct that amount from RMF's total payout of $8,276,986.30 as opposed to following the Escrow Instructions) and to require the title company to record RMF's previously-executed "Satisfaction of Mortgage" and "Termination of Option".  Saypo asserted that "RMF will not be prejudiced in any way by the recording of these documents, since all sums claimed owing to RMF and necessary to satisfy the conditions for the release of RMF's Mortgage and the release of RMF's recorded Option to Purchase either will be distributed to RMF from closing or held by this Court with adequate security."  (Doc. 1-2 at 45.) Further, Saypo offered to interplead with the state district court the disputed amount ($2,734,520.55) and another half of that amount ($1,367,260.28) contributed by Saypo from its net proceeds to cover "any claimed interest charges and attorney fees and costs" in the event RMF were to prevail on the usury claim. Thus, Saypo offered $4,101,780.70 to be held by the clerk of the state district court pending the resolution of the complaint.

25

RMF Scrambles to Catch Up.  On January 4, 2011, at about 2:45 p.m., Daniel Schlager, who was in Denver but not at his office, learned from James Crowley that a voice mail had been delivered to Crowley's office telephone by a man purporting to be Saypo's attorney about a hearing to be held on that day at 2:30 p.m. in Helena regarding Saypo's request for a temporary restraining order. Schlager's secretary confirmed that a similar message had been left for him at his office.  The messages had been left on office voice mail, despite the fact that Saypo's attorney, Neal Christensen, was in regular contact with Schlager and Crowley via their cell phones and email.  Late in the day Schlager was able to review the complaint.  Late that evening, on January 4, 2011, Schlager retained a Montana attorney, Mike Lilly, to represent RMF's interests at the continuation of the TRO hearing in state district court on January 5, 2011.

At that hearing, the parties submitted a stipulation to the court agreeing that the Dyal closing could proceed as scheduled, that all of Saypo's proceeds (over $12 million) would be held by the title company for 10 days pending further negotiations between the parties, that the title company would record RMF's

26

Satisfaction of Mortgage and Termination of Option to Purchase (without which, the Dyal sale could not close), and that the title company would be dismissed from the action.  (Doc. 108-6 Aff. Naomi Rustomjee, Ex. F: Doc. 108-7, Ex. G.)

On January 20, 2011, Saypo and RMF filed a stipulation in the state court case that requested a court order directing First Montana Title Company to disburse to RMF $5,542,467.75, to disburse to Saypo $5,391,222.99, and to deposit the remainder of the funds ($4,101,780.83) with the clerk of court.  The stipulation notes that of the funds deposited with the clerk, $2,734,520.55 represented a sum that was to be distributed to RMF at closing, and $1,367,260.28 represented a sum that was to be distributed to Saypo at closing.  These sums, totaling $4,101,780.83, continue to be held by the Clerk of Court of the First Judicial District, Lewis and Clark County.  The state district court entered the requested order on January 21, 2011.  (Doc. 108-8, Aff. Naomi Rustomjee, Ex H; Doc. 108-9, Ex. I.)

On April 29, 2011, Schlager informed Salmond by letter that RMF was exercising its option to purchase the Ranch and would be ready to close the

transaction within 30 days.  Schlager asserts that Saypo procured RMF's

termination of the Option "under false pretenses."  Schlager states that RMF

rescinds its termination.  Schlager notes that a second Option payment of $125,000

is due on May 2, 2011, but "under the present circumstances, we do not believe

that payment is due."  Schlager states that if the payment is due, RMF will make it

upon reasonable assurances that Saypo has the ability to convey the Ranch to

RMF in accord with the Option.  On May 14, 2011, Jack Salmond responded to

Schlager's letter by stating that he disagreed within everything in the letter and

requesting all future communications to be made through counsel.  (Doc. 108-19,

Aff. Naomi Rustomjee, Ex. P; Doc. 108-20, Ex. Q.)

**STANDARD OF REVIEW**

Fed.R.Civ.P. 56(a) permits a party to seek summary judgment "identifying

each claim or defense—or the part of each claim or defense—on which summary

judgment is sought." A district court may grant summary judgment as to particular claims or defenses when one of the parties is entitled to judgment as a matter of law.  Summary judgment or adjudication is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assn.,* 809 F.2d 626, 630 (9th Cir.1987). The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11.

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters. Fed.R.Civ.P. 56(a), (c); *see also, Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is

ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence of the party opposing summary judgment is to be believed and all reasonable inferences from the facts must be drawn in favor of the opposing party. *Anderson,* 477 U.S. at 255; *Matsushita,* 475 U .S. at 587.  The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252.

The moving party, in supporting its burden of production, "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.,* 210 F.3d 1099, 1102 (9th Cir.2000); *see also, Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (2007) (moving party may prevail "by pointing out that there is an absence of evidence to support the nonmoving party's case").  A "complete failure of proof concerning an essential

30

element of the nonmoving party's case necessarily renders all other facts immaterial" to entitle the moving party to summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire,* 210 F.3d at 1102. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.

"The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.,* 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). "The mere existence of a scintilla of evidence in support of the [party's] position will be insufficient." *Anderson,* 477 U.S. at 252.

31

**DISCUSSION**

<u>Plaintiff's Usury Claim.</u>

Plaintiff claims that the $2.87 million Sale Prior to Exercise Payment, or SPEP, is interest on the $5 million loan.  This is so, according to Plaintiff's theory of the case, because the Loan Agreement and the Option to Purchase Real Estate are not two separate transactions but a single integrated transaction.  The Option's SPEP, in Plaintiff's view, is nothing more than a disguised interest payment on the loan.

However, under Montana law, interest is defined to be compensation *for* "the use, or forbearance, or detention of money. . . ."  *See Scarr v. Boyer*, 818 P.2d 381, 382 (Mont. 1991).  The Option agreement makes clear that the payment of the SPEP is in exchange *for* the right of the optioner (Saypo) to sell the property to a third-party despite the optionee's agreed-upon right of purchase.  Thus, the SPEP payment does not appear on its face to be interest, but instead appears to be a payment for a valuable right.  Although the two contracts were executed

32

contemporaneously by the same parties and relate to the same matter, and

therefore are to be interpreted one in light of the other, *see* Mont. Code Ann. § 28-

3-203, the two contracts cannot logically be merged together.[4]

The Court rejects Plaintiff's theory for the following reasons. The Loan and

the Option are clearly two separate contracts that together comprise the deal struck

by RMF and Saypo. They cannot be merged into one, however, because each

agreement is supported by separate and adequate consideration. First, the $5

million loan is supported by the payment of interest as stated in the Promissory

Note, and, second, the Option agreement is supported by separate payment of

$250,000 and $125,000. *See S & N Equipment v. Casa Grande Cotton Finance

Co.*, 97 F.3d 337, 342 (9th Cir. 1996) (payments under collateral agreement can be

treated as disguised interest on loan agreement where collateral agreement lacks

---

[4]    "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction are to be taken together."  Mont. Code Ann. § 28-3-203.  This statute provides a rule of contract interpretation, not a formula for merger of contracts.  *See Tin Cup County Water and/or Sewer Dist. v. Garden City Plumbing & Heating, Inc.*, 200 P.3d 60, 67 (Mont. 2008).

independent value); *Handi Inv. Co. v. Mobil Oil Corp.*, 550 F.2d 543, 545 (9th Cir.

1977) (not finding collateral payments to be loan interest even when borrower

required to enter into collateral agreement as a condition of the loan of money).

Thus, under *Handi Inv. Co.*, even if Saypo had been *required* to enter into the

Option agreement as a *condition* of the loan (which condition never even was

discussed by RMF and Saypo, so clear were the desires of the parties:  Saypo to

borrow and RMF to buy), that condition would still not transform Saypo's

payments required by the Option agreement into disguised interest on the loan.

Again, this case presents absolutely no evidence of collusion between the parties

to evade the usury statute, and Saypo presents no evidence either that RMF

intended to evade the usury statute, or did not provide adequate compensation in

exchange for the Option, or charged an unreasonable price for the third-party sale

provision.

     In addition, the Option agreement is a valid independent contract.  *See Lee*

*v. Shaw*, 822 P.2d 1061, 1063 (Mont. 1991) (option agreement "is a right acquired

by contract by which the owner of property agrees with another person that he

shall have the right to buy his property at a fixed price within a certain time"). The relinquishment of a legal or contractual right is sufficient consideration to support a contract. *Rickett v. Doze*, 603 P.2d 679, 680 (Mont. 1979); *Naylor v. Hall*, 651 P.2d 1010 (Mont. 1982); *Van Atta v. Schillinger*, 625 P.2d 73, 75 (Mont. 1981) (agreement to be party to collateral contract can be consideration for an option agreement). In this case, the Option was bargained for at arms-length, and Saypo's attorney assisted in the drafting of the Option. Under the Option, RMF bargained for the right to purchase the property, and the terms of the purchase were defined by the exhibits to the Option, such as the Contingent Promissory Note and the Consulting Agreement. Saypo bargained for two cash payments for the Option ($250,000 and $125,000), the right to sell to a third-party under specified circumstances, a loan, an acceptable purchase price for the Ranch ($14 million) to be paid by RMF, and for $10,417 in monthly payments during each month of a single year in the Option Exercise Period. The consideration RMF paid to Saypo for the Option agreement was not only adequate, but substantial. There is no triable fact as to the adequacy of the consideration.

Montana's usury statute does not apply to the Option agreement because the Option agreement is not a loan of money.  *See Nyquist v.Nyquist*, 841 P.2d 515, 518 (Mont. 1992) (unconditional obligation to repay is prerequisite of loan agreement).  Saypo had no unconditional obligation to pay the SPEP; instead, the SPEP is a conditional obligation dependent on whether Saypo sells the Ranch to RMF or to a third-party.  There is no loan and no usurious interest rate or usurious payment.

At his deposition, Jack Salmond testified that at the time he executed the agreements in June, 2010, he considered them to be two separate transactions, each with its own financial terms and consideration.  (Doc. 61-1, Aff. Naomi Rustomjee, Ex. A, Depo. Jack Salmond, 93:3-24.)  Only later, in December, 2010, after conversations with his attorney, did he begin to view it otherwise.  Indeed, had Saypo repaid the loan the day after it was made, as it was permitted to do without penalty, the Option agreement would have continued on as a stand-alone contract.

Certainly, if RMF had no interest or intention of purchasing the Ranch, and

if the Option were merely a sham agreement, *see American Insurers Life Ins. Co. v. J. E. Regenold,* 423 S.W.2d 551, 552 (Ark. 1968), *Kessing v. National Mortgage Corp.*, 180 S.E.2d 823 (N.C. 1971), and *Najarro v. SASI Int'l, Ltd*, 904 F.2d 1002, 1004 (5th Cir 1990), then this Court could and would look closely for disguised interest on the loan.  Likewise, if there were even a scintilla of evidence that the parties colluded to cover up a usurious interest rate, *see Mission Hills Dev. Corp. v. Western Small Business Inv. Co.*, 260 Cal.App.2d 923, 67 Cal.Rptr. 505 (Cal. Ct. App. 1968); *First Nat. Bank v. Danek*, 89 N.M. 623, 556 P.2d 31 (N.M. 1976)*,* then again this Court would look closely for disguised interest on the loan. Those are not the facts of this case, however.

Although the Shared Appreciation Payment ("SAP") of $1.75 million is not pled in the Amended Complaint in support of the usury claim, even assuming that the SAP is interest on the $5 million loan, this Court does not find the loan's interest to be usurious because the term of the loan is clearly five years (June 29, 2010 to June 1, 2015).   According to both parties, Saypo bargained for and obtained a five-year loan. (Doc. 42-2, Aff. Naomi Rustomjee, Ex. A, Salmond

Depo., 140:14-141:1; Doc. 42-3, Ex. F, Christensen Depo., 242:14-25; Doc. 79,

Schlager Aff. ¶ 20.)  Saypo wanted to pay a low interest rate (6%) in the short term

(three years) because it hoped it could pay the loan back by selling the ranch at a

high price before RMF's option became effective on April 2, 2011.  (Doc. 78-2,

Aff. Jonathan Bass, Ex. B, Salmond Depo., 140:7-13.)  Saypo was not absolutely

certain that it could pay the loan back within three years, however, so it bargained

for and received the unilateral right to extend the loan term two extra years

(without payment) by agreeing that a higher interest rate would apply during the

last two years.   Essentially, Saypo had no repayment obligation until June 1,

2015.  When the SAP under the Promissory Note is treated as interest on a five-

year loan term, and added to the actual interest paid by Saypo ($111,780.82), the

total interest paid still does not exceed Montana's limit of 15% per annum over the

five-year term.  *See Pentico v. Mad-Wayler, Inc.*, 964 S.W.2d 708, 714 (Tex. App.

1998) ("[C]ontracts are tested for [facial] usury by spreading the interest over the

entire term of the contract."); *see also Imperial Corp. of America v. Frenchman's

Creek Corp.*, 453 F.2d 1338 (5th Cir. 1972) (true term of loan was initial term plus

38

extensions provided for in contract).  It appears that Saypo bargained for a five-year term, and that it was in fact a loan having a term of five years.

However, the loan term is a relatively unimportant peripheral issue, because the central issue remains whether or not the *Option's* SPEP is disguised interest. There are no Montana 'disguised' interest cases, but in the past, Montana courts have looked to the law of Texas on the subject of usury, because Montana's usury statute is similar to that of Texas.  *See Scarr v. Boyer*, 7818 P.2d 381, 383 (Mont. 1991) (noting similarities between Montana and Texas usury law, adopting "reasoning" of Texas courts); *Anderson v. Traveler's Insurance*, 13 Mont. B.R. 91 (D. Mont 1992) (adopting Texas law regarding usury savings clause); *In re Brummer*, 147 B.R. 552 (D. Mont. 1992) (applying Texas usury law to analyze Montana's usury statute).

Under Texas law, a party claiming usury under a theory of disguised interest must prove either that the parties colluded to evade the usury law or that the lender intended to evade the usury law.  *Richards v. Moody*, 422 S.W.2d 200, 202 (Tex. App. 1967) (borrower claiming usury based on a "multiple-cornered transaction"

39

not usurious on its face must prove "a corrupt agreement or scheme to cover

usury" that was in "full contemplation of the parties"); *see also Handi Inv. Co. v.*

*Mobil Oil Corp.*, 550 F.2d 543, 545 (9th Cir. 1977) (when form of transaction

appears non-usurious, California law requires borrower to prove that lender

intended to evade usury law).

　　Texas courts look to the substance of the transaction to determine whether a

collateral agreement imposes disguised interest.  *See, First State Bank of Bedford*

*v. Miller*, 563 S.W.2d 572 (Tex. 1978); *Loomis v. Blacklands Production Credit*

*Association*, 579 S.W.2d 560, 563 (Tex. App. 1979) (conditioning collateral

purchase of stock on agreement to lend money does not result in collateral

payments being treated as disguised interest because borrower receives

independent value in the stock); *First Bank v. Tony's Tortilla Factory, Inc.*, 877

S.W.2d 285 (Tex. 1994) (Because account holder received independent value, bad

check fee is not interest even though a loan is created when bank covers payment

for account-holder).

　　In this case, Saypo received independent value for the SPEP under the

40

Option by bargaining for and receiving the very valuable right to sell the Ranch to a third party despite the existence of the Option agreement.  Just how valuable this right was to Saypo is indicated by the $20.5 million price paid by Gordon Dyal for the Ranch on January 5, 2011.  In fact, both the loan agreement and the option agreement have independent value.

If Plaintiff's theory were the law, one could never safely enter into any non-loan agreement contemporaneously with a loan agreement, for fear that the consideration for the non-loan agreement would later be deemed to be interest on the loan.  Furthermore, the fact that these agreements cross-reference each other is of no importance to the ultimate question whether there is one transaction or two. Although certain events under one agreement triggered consequences under another agreement, these separate agreements were independently enforceable. For example, Saypo might repay the $5 million loan, but the Option agreement would continue in force and effect.  Conversely, RMF might decline to purchase the property and allow the Option to expire, but the Promissory Note would continue in force and effect.  The fact that the Promissory Note states the order in

41

which payments are to be credited (late charges first, interest second, principal third, payments on the mortgage fourth, Shared Appreciation Payment fifth, SPEP sixth), and includes in that list a payment (the SPEP) which is due under the Option, does not inevitably lead to the conclusion that the SPEP is sham interest or that there is a single integrated transaction. In fact, RMF claims that Saypo's attorney negotiated for that language to protect Saypo's interests. (Doc. 108-18, Aff. Naomi Rustomjee, Ex. O, Depo. James Crowley, 123:3-8.)

Furthermore, there is not one scintilla of evidence that the parties colluded to evade Montana's usury statute. In fact, one of RMF's proposals, rejected by Saypo, was simply to do the entire loan at 15 percent interest. (Doc. 108-17, Aff. Naomi Rustomjee, Ex. N, Depo. Daniel Schlager, 101:9-14.) While there is some suggestion in the record that Saypo's attorney wondered whether the loan agreement was usurious at the time the documents were being drafted and also that he might have thought during the drafting stage that Saypo might be justified in a future breach of the Option agreement on usury grounds, there is no need for the Court to make such a finding. The Court can and does find, however, that RMF

42

did not intend to impose a usurious interest rate on its loan to Saypo.

Finally, the usury savings clause in the Promissory Note saves the Note from any facial claim of usury.  In Montana, usury savings clause have been validated.  *See Poulsen's, Inc. v. Wood*, 756 P.2d 1162 (1988).  In this case, the interest rate under the Promissory Note is not fixed but fluctuates according to the actions of the parties at various points in time.  If for example, Saypo chose to sell the property to RMF between April 1, 2011, and May 2, 2013, Saypo's interest rate on the $5 million loan would be 6%.  If Saypo chose to sell the property to a third-party on June 1, 2013 (just past RMF's Option Exercise Period), however, a Shared Appreciation Payment ($1.75 million) would be added to the 6% interest to result in an interest rate interest rate of approximately 8% over a five-year term or 13.6% over a three-year term.  There are other possible interest rates depending on other changes in the factual circumstances.  In any event, the usury savings clause was used by the parties as a regulator of the Note's fluctuating interest rate to protect the borrower from having to pay usurious interest on the Note.  The usury savings clause, contained in the Promissory Note, is not in the forefront of our

43

attention, however, because Plaintiffs's primary argument is that a payment due under the *Option* agreement makes the interest rate on the Note usurious.

The Court will therefore deny Saypo's second motion for partial summary judgment (Doc. 53), which seeks a ruling that there is one transaction and that the interest on the loan is usurious.  The Court cannot agree with either proposition. While Saypo granted RMF an Option to Purchase the Ranch at a cost to RMF of $250,000 paid in 2010 and $125,000 paid in 2011, Saypo also negotiated for and received an opportunity to sell the Ranch to a third party at a cost to Saypo of 14% of the third-party sale price.  This negotiated price was high, at least in part, because RMF did not want Saypo to sell the Ranch to a third party.  This was an arms-length transaction, and Saypo was represented by counsel.  The SPEP was bargained for and fairly obtained under all the circumstances.  It was mirrored by a similar provision running in the opposite direction in Saypo's favor.  The easy way for Saypo to avoid paying the SPEP was simply to sell the Ranch to RMF pursuant to the Option.  If that option did not suit Saypo because it could obtain a better third-party offer, the SPEP actually benefitted Saypo by telling Saypo precisely

44

what its cost would be to 'buy back' RMF's Option.  Thus Saypo could judge

accurately the financial benefit of any third-party offers.  The harder way for

Saypo to avoid paying the SPEP was to file the instant litigation.


Defendant RMF's Motion for Summary Judgment
as to Saypo's Amended Complaint

For all the reasons stated above, Defendant RMF's Motion for Summary

Judgment (Doc.  77), which is premised on the assertion that there is no genuine

material issue of fact as to its liability on the Amended Complaint, is well taken.

RMF has no liability as to Saypo's usury claim in the Amended Complaint.


Plaintiff's Motion for Partial Summary Judgment
as to RMF's Fifth Counterclaim.

Saypo asserts that it is entitled to partial summary judgment as to RMF's

Fifth Counterclaim for breach of the Option contract, by which Counterclaim

RMF seeks to enforce its option to purchase the Ranch (but not against good faith

purchasers for value, presumably meaning Gordon Dyal).  (Doc. 102.)  This Fifth

Counterclaim is predicated on the Fourth Counterclaim, by which RMF claims that it is entitled to rescind its termination and exercise its option to purchase the Ranch, as in fact RMF did attempt to do by letter dated April 29, 2011.  (Doc. 108-19, Aff. Naomi Rustomjee, Ex. P.)  (In its rescission letter, RMF also offered to pay to Saypo the second Option payment of $125,000, coming due on May 2, 2011, if reasonable assurances of a forthcoming transfer of the Ranch under the Option could be made by Saypo.)

In response to the Fifth Counterclaim and in seeking partial summary judgment on the Fifth Counterclaim, Saypo contends that RMF consented to the third-party sale by its stipulation on January 5, 2011, and that RMF cannot now exercise an option that RMF previously terminated.  However, Saypo seems to miss the point that RMF does not wish to rescind its Option but to rescind its Termination.  Saypo contends also that it is not possible for it to convey the Ranch to RMF, although Saypo concedes that it does still own the 40-acre parcel.  RMF believes that its Option agreement covered both the 12,000 acre parcel and the 40-acre parcel.  (Doc. 108-17, Rostomjee, Ex. N., Depo. Dan Schlager, 46:16-47:13.)

46

Saypo concedes that the Option did cover both the 12,000 acre parcel and also the 40-acre parcel. (Doc. 113 at 12.) Saypo's argument that RMF cannot now rescind its Termination of the Option, because RMF terminated its Option, merely begs the question. Saypo correctly points out that RMF's Option agreement provided for not only a life estate in Jack Salmond as to the 40-acre parcel, but it also provided *Saypo* an option to purchase the 40-acre parcel back from RMF at a price based on a fair market appraisal. (Doc. 113 at 13; Doc. 114-3, Aff. Trent Gardner, Ex. 3, Depo. Daniel Schlager, 50:7-15.)

The parties' second stipulation, dated January 20, 2011, calls for the title company to disburse $5,542,467.75 to RMF and to disburse $5,391,222.99 to Saypo, depositing the remainder of the funds ($4,101,780,83) with the state clerk of court, but it specifies that *the release of funds is not to be "construed as a release, waiver or compromise of the parties' rights and claims in this action*." (Doc. 108-8 at 3; emphasis added.) Clearly, by agreeing that the title company should record RMF's Termination of Option, RMF released and waived any right it had under the Option as against Gordon Dyal. However, it appears that, as

47

against Saypo, RMF did not on January 5 or January 20 stipulate to a release or waiver of its rights under the Option.  Moreover, it does appear to the Court that a genuine issue of fact exists regarding whether Saypo procured the Satisfaction of Mortgage and the Termination of Option from RMF by fraud.

Saypo defends against the Fifth Counterclaim by asserting that the equitable doctrine of promissory estoppel should bar RMF's Fifth Counterclaim for breach of the Option contract.  Saypo's theory is that it acted in reliance upon RMF's stipulation dated January 5, 2011, that the third-party sale should go forward. That stipulation states that "immediately upon closing today Title Company shall record the Satisfaction of Mortgage and the Termination of Option to Purchase, thereby providing clear title to the non-party purchaser...." (Doc. 108-7 at 3-4.) Saypo further argues that it would not have closed the Dyal sale had RMF not agreed to it.  With this last assertion, the Court cannot agree.  On the day prior, January 4, 2011, Saypo had already filed an Amended Complaint and Motion for TRO requesting that the state district court *order* the title company both to record RMF's Satisfaction of Mortgage and the Termination of Option and also to

48

withhold from RMF the SPEP payment (or cash equivalent).  The stipulation

offered a convenient route to getting what it wanted, but Saypo would have

continued to seek the district court's temporary restraining order absent that

stipulation, and if successful Saypo would have proceeded to closing.   (The

contrary view would require the Court to believe that Saypo filed its complaint

and requested the TRO without any intention of following through on the

litigation but only for the purpose of intimidating RMF into allowing Saypo to

close the Dyal sale.)  The evidence indicates that Saypo would have gone forward

with the third-party sale on January 5, 2011, even absent RMF's stipulation.[5]

Furthermore, promissory estoppel is an equitable defense when asserted by

Counter-Defendant Saypo under these circumstances.  The doctrine of unclean

hands applies in such a circumstance to negate Saypo's equitable defense.  *See*

---

[5]    Had RMF refused to enter into the stipulation and thereby persuaded the
state district court to block the Dyal sale, RMF could have ultimately been sued by
Saypo and Dyal for interfering with the sale.  Thus, Saypo maneuvered RMF into
a difficult dilemma, *i.e.*, risking losing the SPEP, on the one hand, and risking
being held responsible for blocking the Dyal sale, on the other.

*Kauffman-Harmon v. Kauffman*, 36 P.3d 408, 413 (Mont. 2001) ("Parties must not expect relief in equity, unless they come into court with clean hands.") (*quoting In re Marriage of Burner*, 803 P.2d 1099, 1100 (Mont. 1991). *See also* Mont. Code Ann. § 1-3-208 ("A person may not take advantage of the person's own wrong."). Saypo is a party who comes to the Court having conducted itself unethically with respect to the subject matter–not only the manner in which Saypo obtained the release of the mortgage and the termination of the option, but also in the manner in which Saypo lay in wait until the eleventh hour to spring its litigation upon RMF-- literally, to take RMF by surprise--and to give RMF only a few hours to secure unfamiliar out-of-state counsel by telephone in the thin hope of protecting its rights. Saypo's bid to benefit once again by this prior conduct–to enforce its interpretation of the stipulation against RMF under an equitable theory of promissory estoppel–will not be facilitated by this Court.

As Counter-Defendant, Saypo challenges the equitable remedy requested by RMF's Fourth Counterclaim, to wit, rescission of RMF's termination of the Option. Assuming its success in defeating the Fourth Counterclaim, Saypo seeks a

50

favorable judgment on the Fifth Counterclaim, as well, by arguing that there is no contract that could have been breached.  In addition, Saypo asserts the equitable defense of impossibility.  Again, however, the equitable doctrine of unclean hands–RMF's claim that defendant is acting unethically or in bad faith regarding the subject of the complaint–can be used offensively by the Counter-Plaintiff RMF to negate an equitable affirmative defense such as impossibility.  So, not only factually does Saypo lose because it does still own the 40-acre parcel and has produced no evidence that Saypo cannot repurchase the Ranch from Dyal, but also, equitably, Saypo loses because it is its own wrongdoing that put it in its present predicament of not owning the Ranch that would permit it to fulfill its obligation to RMF under the Option contract.

Significantly, RMF does not seek to press its rights to the detriment of a good faith purchaser for value.  Perhaps only money damages may be available as to the 12,000 acre parcel.  However, specific performance may be available as to the 40-acre parcel.

<u>Plaintiff Saypo's Motion for Summary
Judgment as to RMF's Fraud Counter-Claim.</u>

Lastly, the Court examines Saypo's first summary judgment motion.  (Doc.

31.)  Saypo seeks partial summary judgment as to RMF's fraud claim.  Saypo

asserts that RMF cannot prove the nine elements of fraud under Montana law: (1)

a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of

its falsity or ignorance of its truth, (5) the speaker's intent that it should be relied

upon, (6), the hearer's ignorance of falsity of the representation, (7) the hearer

must rely on the representation, (8) the hearer's right to rely on the representation,

(9) consequent and proximate injury caused by the reliance.  *Pipinich v.*

*Battershell*, 759 P.2d 148, 151 (Mont. 1988).  In particular, Saypo asserts that, on

January 5, 2011, RMF was neither ignorant of Saypo's decision not to the pay the

SPEP, nor entitled to rely on Saypo's prior "allegedly" deceitful statements to the

contrary, because when RMF had discovered the truth of the matter on January 5,

2011, it entered into a stipulation permitting the title company to record the

termination of the option.  Therefore, Saypo believes, RMF cannot show

ignorance or reliance on false statements.

However, RMF has successfully demonstrated numerous genuine issues of material fact–including RMF's claim that the fraud was completed by November 12, 2010, the claim that RMF did not release its rights under the Option simply by allowing a fraudulently procured termination to be recorded, or the fact that RMF was blind-sided in January 2011 as part of the ongoing fraud–all of which require that Saypo's summary judgment request as to the Third Counterclaim (Fraud) be denied.   RMF does not seek summary judgment as to its Third Counterclaim, but instead seeks to submit it to a jury.  Although the Court has evaluated RMF's fraud evidence carefully and given it significant weight as against Saypo's promissory estoppel and reliance arguments, this Court has not thereby adjudicated the Third Counterclaim.  The Court merely notes RMF's contention that Saypo's fraud began in June 2010 with the drafting of the documents and continued through January 2011.

**CONCLUSION AND ORDER**

As to the question of usury, the Court finds that the evidence is so one-sided that Defendant must prevail as a matter of law.  The Court finds that no genuine issue of material fact precludes summary judgment in favor of RMF on its Motion for Summary Judgment.  RMF is therefore entitled to judgment as a matter of law on Saypo's usury claim as set forth in its Amended Complaint.

The Court finds further that genuine issues of material fact exist as to Counter-Plaintiff RMF's Third Counterclaim (Fraud) and as to RMF's damage claims.

Accordingly,

IT IS HEREBY ORDERED that Plaintiff Saypo's Motions for Partial Summary Judgment (Doc. 31, Doc. 53, Doc. 102) are DENIED.

IT IS FURTHER ORDERED that Defendant RMF's Motion for Summary Judgment (Doc. 77) is GRANTED, and the Amended Complaint is DISMISSED. The Court confirms the trial date of December 10, 2012, for the trial of RMF's

Counterclaims contained in its Amended Answer.

It appearing to this Court that the case is now ready for a court-supervised settlement conference,

IT IS FURTHER ORDERED that this matter is referred to United States Magistrate Judge Carolyn S. Ostby for the purpose of conducting a settlement conference, which will be set down by her by subsequent order.  Those individuals having ultimate settlement authority shall be present personally at the conference.

The Clerk is directed forthwith to notify U.S. Magistrate Judge Ostby of the entry of this order.

Done and Dated this 28th day of September, 2012.


CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE